FILED
2016 Sep-14  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **RHONDA K. CHRISTIAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 6:15-cv-00619-JEO** |
| | } | |
| **CAROLYN COLVIN,** | } | |
| **Commissioner, Social Security** | } | |
| **Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Plaintiff Rhonda K. Christian brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  (Doc. 1).[1]  This case has been assigned to the undersigned pursuant to this court's general order of reference.   The parties have consented to the jurisdiction of this court for the disposition of the matter.  (Doc. 14).  *See* 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(a).  Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed.

---

[1] References herein to "Doc. ___" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

## I.     PROCEDURAL HISTORY

Plaintiff filed her application for disability insurance benefits under Title II of the Social Security Act on May 9, 2012, alleging that she became disabled beginning May 4, 2012.  (R. 10, 127, 138).[2]  Her application was initially denied on October 18, 2012.  (R. 74).  On January 31, 2014, following a hearing, an Administrative Law Judge ("ALJ") denied Plaintiff's application for disability benefits, concluding that she is not disabled under the Social Security Act.  (R. 26). The Appeals Council declined to grant review of the ALJ's decision.  (R. 1). Plaintiff then filed this action for judicial review pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).  (Doc. 1 at 1).

## II.    STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, this court's role is a narrow one.  "Our review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, and whether the correct legal standards were applied."  *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *see also Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). The plaintiff must demonstrate that the decision of the Commissioner is not supported by substantial evidence. *See, e.g., Allen v.*

---

[2] References herein to "R. ___" are to the administrative record located at Doc. 4 (Answer of the Commissioner).

*Schweiker*, 642 F.2d 799 (5th Cir. 1981).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Winschel v. Comm'r. of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner], rather [it] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1982)) (internal quotations and other citations omitted); *see also Dyer v. Barnhart*, 395 F. 3d 1206, 1210 (11th Cir. 2005).  The court gives deference to factual findings and reviews questions of law de novo.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).  Accordingly, "[n]o … presumption of validity attaches to the [Commissioner's] conclusions of law."  *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## III.   STATUTORY FRAMEWORK

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i)(1).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Social Security Act requires a five step analysis.   20 C.F.R. § 404.1520(a).   Specifically, the Commissioner must determine in sequence:

> whether the claimant: (1) is unable to engage in substantial gainful activity; (2) has a severe medically determinable physical or mental impairment; (3) has such an impairment that meets or equals a Listing and meets the duration requirements; (4) can perform his past relevant work, in light of his residual functional capacity; and (5) can make an adjustment to other work, in light of his residual functional capacity, age, education, and work experience.

*Evans v. Comm'r of Soc. Sec.*, 551 F. App'x 521, 524 (11th Cir. 2014)[3] (citing 20 C.F.R. § 404.1520(a)(4)).   "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.   A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"   *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).   "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do."   *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).   The Commissioner

---

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

must further show that such work exists in the national economy in significant numbers. *Id*.; *Evans*, 551 F. App'x at 524.

## IV.   DISCUSSION

### A. Facts

Plaintiff was 53 years old at the time of the ALJ's decision. (R. 37-38). She has a high school education and attended vocational school for nursing. (R. 38). Plaintiff has past relevant work as a LPN. (R. 54). She alleges a disability onset date of May 4, 2012. (R. 10).

Plaintiff alleges in her initial disability report that she was unable to work due to "Back Injury" and "Arthritis." (R. 142). At her administrative hearing, she testified that she could not walk or sit for more than 10 minutes at a time due to her back pain. (R. 40). She stated that she cannot stand in one position; she "alternate[s] legs when [she's] in a standing position, just you know, like a rocker rocking back and forth." (R. 40). Plaintiff testified that she spent "about six" hours a day, during normal work hours, lying down in bed to deal with her pain. (R. 40). She testified that "on a good day" her pain was a six; when her medication wears off, her pain is a ten. (R. 41).

Plaintiff further testified that she was only able to sleep three hours continuously at night because of her pain. (R. 42). Other than activities involving bending or twisting, like putting on shoes, Plaintiff testified that she was able to

dress and care for herself. (*Id.*) She stated that her husband took care of the household chores and cooking, though she could make "sandwiches and microwavables and things like that." (R. 42-43). She testified she could consistently lift a half gallon daily, but not more than that because "the more I do, I know I shouldn't do it…. Because of the pain. The pain becomes worse." (R. 43).

Following Plaintiff's hearing, the ALJ found that she had not engaged in substantial gainful activity since May 4, 2012, the alleged onset date. (R. 13). The ALJ determined that Plaintiff had the following severe impairments: status post lumbar laminectomy times two secondary to a work related herniated nucleus pulposus, chronic severe muscle spasms of the lower back secondary to lumbosacral neuropathic dystonia, osteoporosis, degenerative joint disease/arthritis, and obesity. (R. 13). The ALJ also determined that Plaintiff had the following non-severe impairments: carotid artery stenosis, hypercholesterolemia or hyperlipidemia and vitamin D deficiency, rash, dyshidrosis, bronchitis, plantar fasciitis, pernicious anemia, fatigue/malaise, restless leg syndrome, and edema. (R. 17-18). The ALJ concluded that Plaintiff's impairments do not meet or medically equal one of the listed impairments. (R. 18). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work "except with only occasional stooping and crouching; no

climbing; no driving; no upper extremity or right lower extremity pushing and/or pulling; and a temperature controlled environment."  (R. 19).  The ALJ found that Plaintiff could not perform her past relevant work as a LPN.  (R. 24).

Relying on the Vocational Expert's ("VE") testimony, the ALJ found that jobs exist in the national economy that Plaintiff could perform, including information clerk and office helper.  (R. 25).  The ALJ concluded, therefore, that Plaintiff was not disabled under the meaning of the Social Security Act during the relevant period.  (R. 25-26).

## B. Plaintiff's Claims

Plaintiff initially asserts that the ALJ failed to properly consider the opinions and conclusions of Dr. Candice Hagler, her treating physician.  (Doc. 9 at 29).  She also asserts that the ALJ improperly discredited her subjective testimony and posed an incomplete hypothetical to the Vocational Expert. (*Id*. at 46 & 55)

## 1. Dr. Hagler's Opinions and Conclusions

A treating physician's opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Good cause" is found in three circumstances: (1) when a doctor's opinion is not supported by the evidence; (2) when the evidence supports a contrary finding; (3) when the doctor's opinions are either conclusory or internally inconsistent.  *See id.*  "The ALJ must clearly articulate the reasons for

giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

The ALJ stated as follows concerning Dr. Hagler:

Dr. Hagler, the claimant's primary care physician, completed a function capacity assessment in November 2013 at the request of her attorney, in which she indicated that the claimant could sit for no more than one hour total in an entire workday and could stand and/or walk for no more than one hour total in an entire workday, and that she had to spend three to four hours lying/recumbent in an entire workday. Dr. Hagler also reported that the claimant could lift and/or carry no more than 10 pounds and that she could be expected to miss 30 full or partial days of work over the course of the year as a result of her ailments taken in combination. Dr. Hagler also indicated in her sworn statement in November 2013 that the claimant had a need to lie down on and off during the day for at least two to four hours and that she had a pain level a[t] 6 or 7/10 even on medication and would be unable to maintain any sort of competitive employment.

(R. 21).[4]  The ALJ further stated that he gave little weight to Dr. Hagler's opinions and conclusions because Dr. Hagler's findings were inconsistent with the records of Dr. Edwin L. Kelsey, the report of Dr. Grant Michael Clark, and Dr. Hagler's own records. (*Id.*) The ALJ explained that Plaintiff has not complained of "disabling back pain or limitations" since her alleged onset date (R. 22),  Dr. Kelsey's treatment notes do not indicate disabling pain (*id.*), and there were numerous inconsistencies between Plaintiff's testimony and her function report (R. 23).  Plaintiff challenges each of these determinations.  They will be addressed below.

---

[4] Dr. Hagler's "Functional Capacity Assessment" is located at R. 361-62.

### a. Dr. Hagler

The record demonstrates that Dr. Hagler first saw Plaintiff in 2008.  (R. 260 & 355).  Plaintiff initially complained of back pain, which she attributed to sitting in a new chair at her desk.  (*Id.*)  Dr. Hagler prescribed Ibuprofen or Celebrex daily, back stretches and a heating pad daily, and a change in Plaintiff's desk set-up.  Dr. Hagler also stated that she was going to follow Plaintiff's progress "closely."  (*Id.*)  Dr. Hagler saw Plaintiff numerous times from 2008 through her alleged disability onset date in May 2012.  Among other complaints, Plaintiff continued to report knee and foot pain.  (R. 221, 239, 241-42, 243, 246, 248, 251, 253 & 256).  Plaintiff's history of chronic back pain "secondary to an injury" was consistently documented during this period.  (R. 241, 243, 246-48, 249, 251-258).  Dr. Hagler testified that she personally witnessed Plaintiff's pain symptoms because Plaintiff previously worked with her for an extended period.  Specifically, Dr. Hagler stated:

> It got to the point where when she would sit at her desk to do computer work or phone messages, she would have trouble after only a few minutes of sitting with the pain.  Her pain would get worse the longer she sat.  And in situations where she would have to bend over or squat to … put a bandage on someone's foot or do something where she would have to bend over, like she would have a lot of pain with that and it would be difficult for her to perform that task when needed.

(R. 358).

After Plaintiff's alleged disability onset date, Dr. Hagler's treatment notes reflect that Plaintiff experienced foot pain.  (R. 221, 228, 237-39).  It was described as "daily" "acute" "foot pain." (*Id*).  Dr. Hagler explained that the "[p]ain starts after walking for a while and gets worse as the day goes on."  (R. 221, 228, 237). Plaintiff's foot pain was managed via medication.  (R. 221, 228, 217). Dr. Hagler's visit notes also consistently list Plaintiff's "chronic back pain" in the "Past Medical History" section after the alleged onset date.  (R. 218, 222, 225, 229, 231, 234, 237).  However, Dr. Hagler's records during this period also show that Plaintiff never complained specifically of "disabling back pain or limitations."  (R. 21). While Dr. Hagler's treatment notes do list Plaintiff's chronic back pain, they do not provide evidence to support the limitations enumerated by Dr. Hagler in the functional capacity assessment done in November 2013.  To the contrary, while the notes chronicle Plaintiff's history of chronic back pain, they do not indicate the type of debilitating limitations articulated by the assessment.  While the court does credit Dr. Hagler's observations of Plaintiff as having difficulty performing at work as a nurse, that alone is insufficient to support the limitations suggested in the assessment.  Additionally, those observations do not demonstrate that the conclusions and limitations articulated by the ALJ in his decision are erroneous.[5]

---

[5] The ALJ found that Plaintiff "has the residual functional capacity to perform light work … with only occasional stooping and crouching; no climbing; no driving; no upper extremity or right lower extremity pushing and/or pulling…"  (R. 19).

### b.  Dr. Kelsey

Plaintiff next argues that Dr. Kelsey's treatment notes are not inconsistent with Dr. Hagler's opinions and conclusions.  (Doc. 37-9).  On June 20, 2012, during Plaintiff's first visit with Dr. Kelsey after her alleged onset date, Plaintiff told Dr. Kelsey that she

> is no longer working at all.  She states that her back pain has reached the point where she just cannot continue to work in her capacity as a nurse or any other meaningful format without taking a lot of narcotic pain medication to control this.  She does not want to become totally dependent on narcotic pain medications and therefore, she is applying for long-term disability.

(R. 190).  Thereafter, Dr. Kelsey states:

> I concur with her that sometimes this is a situation that might be best amended with her taking **a slow approach to life**.  Patient continues to control the amount of medications she takes for pain very judiciously in order to prevent any type of addiction or dependency.

(*Id*. (bold added)).  After a physical examination, Dr. Kelsey noted that there was "[n]o significant change from her last exam which the patient was having a lot of problems with forward flexion as well as left lower extremity radiculopathy. Another possibility to control some of the pain might be an epidural block."[6]  (R. 190).

---

[6]  The notes from Plaintiff's prior visit on March 21, 2012, state:

> Ms. Christian comes in today stating that she is having more and more problems at work and she really feels that she no longer can keep up her schedule necessary as a nurse in the long-term care facility without escalating her medication to the

The ALJ found as follows concerning Plaintiff's medical history with Dr.

Kelsey:

> Although the claimant has alleged disability related to her back impairments, Dr. Kelsey, who has treated the claimant for her back impairments for many years, has not reported that she had disabling pain or limitations. His records indicate that the claimant has experienced occasional flare-ups of her pain, but she worked for many years subsequent to her back surgeries despite her pain. Although the claimant reported to Dr. Kelsey in June 2012 that she was no longer working at all and that she could not work in any capacity as a nurse or in any other meaningful format without taking a lot of narcotic pain medication, Dr. Kelsey did not report that he believed the claimant to be disabled. He believed her situation might best be amended "with her taking a slow approach to life," but he did not report that he believed her to be disabled. The claimant reported flare-ups of her back pain to Dr. Kelsey in June 2013 and September 2013, but Dr. Kelsey did not report at those visits that he believed the claimant to be disabled.

(R. 21).

Plaintiff argues that the opinion of Dr. Kelsey, like Dr. Hagler, is entitled to

greater weight because of the "longitudinal picture" that he can provide concerning

---

> point where she feels it might be detrimental to her. She admits that she will probably be putting in for her long-term disability at this point.

(R. 177). Dr. Kelsey also noted the following in Plaintiff's physical examination:

> Patient is having more problems with pain and tenderness in the lower back. Forward flexion greater than 70 degrees increases her pain. This tends to radiate into her left lower extremity. Patient has a mildly positive straight leg raise on the left at 60 degrees in the supine position.

(*Id*.) Plaintiff was diagnosed with status-post lumbar laminectomy secondary to a work-related HNP; severe chronic muscle spasms down the lower back secondary to LS neuropathic dystonia; and osteoporosis. (*Id*.)

her condition.  (R. 29-32).  Plaintiff then states, "Dr. Kelsey objectively found 'pain and tenderness in the lower back'" that radiated to her lower left extremity in a March 2012 physical examination.  (Doc. 9 at 35 (citing R. 177)).  Lastly, Plaintiff states that Dr. Kelsey agreed with her statement that she could not perform meaningful work without taking a lot of narcotic pain medication.  (*Id.* (citing R. 190)).

Dr. Kelsey's records demonstrate that Plaintiff did experience a change in her condition in 2012 and that her condition was long term.  Additionally, during her June 19, 2013 visit, Plaintiff stated that her back pain had flared-up and was radiating into her left lower extremity.  (R. 216).  Dr. Kelsey also noted positive straight leg responses while Plaintiff was in the sitting and supine positions.  (*Id.*) Plaintiff was continued on her medication and directed to follow-up with Dr. Kelsey in three months.  During her September 26, 2013 visit, Plaintiff admitted having "good and bad days."  (R. 217).  Dr. Kelsey noted "she still needs to continue taking her medication as prescribed."  (*Id.*)  During both visits, Dr. Hagler diagnosed Plaintiff with "[s]evere chronic muscle spasms down the lower back and leg secondary to LS neuropathic dystonia." (R. 216-17).

Dr. Kelsey's observations and assessments demonstrate that Plaintiff had additional pain and tenderness, a reduced range of motion in her lumbar spine, and positive straight leg tests on her left side in mid-2012.  (R. 177).  While these

observations and assessments are consistent with and supportive of Plaintiff's severe impairment, they do not support the extreme limitations enumerated in Dr. Hagler's opinion.   To the extent that Dr. Kelsey noted Plaintiff's situation "might be best amended with her taking a slow approach to life" after Plaintiff stated she could not continue to work as a nurse or in "any other meaningful format" without significant narcotic pain medication, that statement does not equate to Plaintiff not being able to work at all or justify the severe limitations enumerated by Dr. Hagler.

### c.  Dr. Clark

Plaintiff next argues that Dr. Clark's examination of her "does not support" a finding contrary to Dr. Hagler's opinion.   (Doc. 9 at 33, 42-45).   Specifically, Plaintiff states the ALJ failed to demonstrate good cause for preferring the opinion of Dr. Clark over that of Dr. Hagler.   (*Id*. at 42-45).

During Dr. Clark's interview to obtain Plaintiff's personal history, Plaintiff stated as follows:

> ….  She states that she has been struggling with low back pain for at least 10 to 15 years.  She states that it began as a work-related injury. She was working in a healthcare setting helping to transfer a patient. She had an acute onset of back pain and subsequent workup demonstrated disc bulge at L4-L5 and L5-S1. She states that she subsequently underwent laminectomy at L4-L5 and L5-S1 in 1999. Even after a surgery, she has continued to have significant back pain and she has been referred on to the Pain Clinic where she [is] see[n] every two months. She states the low back pain is in the lower lumbar region and radiates down her right leg and then to her right foot  The radiation pattern generally spreads from the back of the buttock and down into [the] right foot.  She has also noted a few months ago that

> she was starting to note more foot pain, describes them as a squeezing pain in the right foot more so than the left at times. She does have some left foot pain. She is unsure of whether or not it is related to her back pain. Apparently, her health care providers have been unsure of this as well. She states that the back pain is worse with activity, climbing stairs, and sitting for long periods of time. She states that the pain is better with shifting her position and taking her medicines, including Lortab and Celebrex….

(R. 195). In Plaintiff's "History of Functional Status," Dr. Clark stated:

> She is able to dress herself and feed herself. She is able to stand. She can make it up 30 minutes at once and a total of four hours in an eight-hour workday. She is able to walk on level ground for about 30 minutes at once and she is able to sit in one position at 30 minutes at a time. She is able to lift very little …, she estimates about 5 pounds. She is able to drive a car for about 30 minutes at once. She has household chores including cooking for about 30 minutes, dishes for 15 minutes and shopping for 30 minutes.

(R. 196). Following his examination and assessment, Dr. Clark noted in the

"Impressions" section as follows:

> Ms. Christian overall gave good effort today. She was able to ambulate throughout the office without the use of assistive device and demonstrated a normal gait.
>
> 1. Low back pain. From Ms. Christian's examination today, she did demonstrate some decreased range of motion in the low back and had positive straight leg testing in the seated and supine position. It is conceivable that working [a] job that would require her to transfer [a] patient, to move [a] patient would be difficult for her…. Note that some portions of more advanced ambulation testing (squatting) was difficult for her; however, she was able to ambulate normally without use of an assistive device. Other job[s] such as working in a retail store that would not require heavy lifting may be feasible for her.
>
> ...

3. Left knee arthritis.  Ms. Christian had a left knee surgery and I did note minimal swelling of this joint today and very minimal decrease in range of motion.  I suspect that her inability to complete some of the more advanced ambulation testing is most likely due to back pain and not necessarily knee impairment, however, it is feasible that [a] job that would require repeated squatting down and getting up would be difficult for her.  Overall impairment from the knee, however, is mild.

(R. 199-200).

Dr. Clark's report is in most respects inconsistent with Dr. Hagler's Functional Capacity Assessment.  (R. 361-362).  They do agree, however, that Plaintiff should be restricted from heavy lifting or repeated squatting.  (R. 21, 199-200).  Beyond that commonality, they diverge.  Dr. Hagler believes Plaintiff needs to lie down or remain recumbent almost half the day. Dr. Clark indicates that Plaintiff could work in a retail store so long as it did not require heavy lifting or squatting.  (Compare R. 199 & 362).  Additionally, while Dr. Hagler believes Plaintiff would miss approximately 30 days of work per year, Dr. Clark  makes no such finding in his assessment.  Additionally, nothing in the record other than Plaintiff's statements would support such a conclusion.[7]  Thus, the court finds that Dr. Clark's report and findings do not support the findings and limitations proposed by Dr. Hagler in his functional capacity assessment.

---

[7] If one accepts Plaintiff's testimony that she requires about six hours rest from 8:00 a.m. until 5:00 p.m. on most days and rest all day long on bad days, which occur four days a week, she would never be able to go to work.  (See R. 40-41).

## 2.   Evaluating Plaintiff's Credibility

Plaintiff next challenges the ALJ's evaluation of her credibility.  She asserts the ALJ failed to consider the objective medical evidence and "manufactur[ed] supposed inconsistencies that did not actually exist."  (Doc. 9 at 46 & 49).  The Commissioner retorts that the ALJ properly evaluated the credibility of Plaintiff's subjective complaints of disabling symptoms.  (Doc. 12 at 10).

When a claimant asserts disability premised on pain or other subjective symptoms, he or she must present evidence to support the Eleventh Circuit's pain standard.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition and (2) either (a) objective medical evidence confirming the severity of the alleged pain or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  Applying this standard, Chief United States District Judge Karon O. Bowdre has stated:

> If an ALJ discredits a claimant's subjective complaints, he must give "explicit and adequate reasons" for his decision.  *See* [*Foote*], [67 F.3d] at 1561-62.  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Id.* at 1562.  The ALJ's credibility determination need not cite "particular phrases or formulations" as long as it enables

the court to conclude that the ALJ considered the claimant's medical condition as a whole. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210-11 (11th Cir. 2005) (citing *Foote*, 67 F.3d at 1561).

*Siquina v. Colvin*, Case No. 3:11-cv-3269-KOB, 2013 WL 5521156, *6 (N.D. Ala. Sept. 30, 2013). In making this assessment, an ALJ "is entitled to consider inconsistencies between a claimant's testimony and the evidence of record." *McCray v. Massanari*, 175 F. Supp. 2d 1329, 1338 (M.D. Ala. 2001).

In this case, Plaintiff stated in her June 15, 2012 Function Report that her daily activities consist of the following:

> Go to bathroom, drink coffee, watch [the] news, lie back down around noon. Get up and prepare lunch, usually sandwiches or soups. I will fold clothes then lie down on couch for about 30 min. Sit on porch for a little while, visit with my mom for about an hour. Go to Church on Wed. and Sun. Usually go out for supper on those days. Other days we fix soups, salads or frozen dinners or sandwiches. I try to wash dishes every day with help from husband. I take a bath before bed.

(R. 151). She further stated she could not "sleep longer than 4 hrs., (sit longer than 30 min. in [a] chair)," or "stand long enough to do anything" in the kitchen other than prepare the simple foods that she ate every day. (R. 152-153). She described her limits as follows:

> Lifting – only 15 lbs, squatting – knee surgery, bending – back surgies [sic], walking – back and knee surgery's [sic] – no walking over 30 min., sitting – 30 min, kneeling – knee surgery, stair climbing – try to avoid dlf [sic] back and knee. Completing tasks – back can only allow me to do so much. Standing – feet swell. Reaching – pulls back muscles to [sic] tight.

(R. 156).

Plaintiff's hearing testimony was summarized, in pertinent part, by the ALJ as follows:

> …. The claimant testified that she was supposed to have another back surgery, but had put it off.  She testified that she could not sit, stand, or walk very much and that she spent most of her time lying down.  She estimated that she could sit, stand, and walk each for about 10 to 15 minutes at a time.  The claimant testified that she had to lie down a total of six hours a day on a regular basis, but that she had four bad days each week during which she had to lie down all day.  The claimant testified that her pain was 6/10 on a good day and a 10/10 when her medication started wearing off.  She testified that she took Lortab three times a day, with no side effects.  She testified that her medications were slightly effective for pain. The claimant testified that she could only sleep up to three hours total at night, despite Ambien which was not very helpful.  The claimant testified that she had difficulty putting on shoes and socks and sometimes pants.  She testified that she had difficulty bending over.  The claimant testified that her husband did the grocery shopping and cleaning.  The claimant testified that she could prepare microwavable food.  She testified that she could not play with her grandchildren or go on trips or engage in previous activities such as hunting and bike riding.  The claimant testified that she could lift no more than a half-gallon.  She testified that she tried to avoid stairs.  She testified that she resigned from her most recent job in Dr. Hagler's officer in May 2010 because of her pain.

(R. 20-21).  In assessing this testimony, the ALJ stated:

> Although the claimant testified to extremely limited daily activities, and Dr. Hagler reported that the claimant had to lie down much of the day, the claimant previously indicated in her function report that her daily activities included preparing meals, folding clothes, sitting on the porch, visiting with her mother for about an hour, going to church on Wednesday and Sunday, going out to supper on those days, and washing dishes every day with her husband's help….  The claimant also indicated … that she did some ironing and dusting, spent 30 minutes preparing meals on a daily basis, went outside walking or driving a car every day, shopped in stores for groceries, watched

television, read, and took her mother to the local pharmacy once a month. Although the claimant reported that she could not finish what she started, she also reported that she could pay attention for one hour and follow instructions "good." The claimant's ability to engage in such activities as watching television and reading, and her ability to pay attention for one hour and follow instructions well is not consistent with a disabling level of pain. Despite the claimant's reports of an inability to sit, stand, or walk for more than 10 to 15 minutes each, she indicated in her function report that she could walk for 30 minutes before needing to stop and rest. She also reported that she could sit for 30 minutes. Her prior admissions contradict her testimony of experiencing disabling restrictions. Consequently her allegations of a complete inability to work are not fully credible.

(R. 23).

Plaintiff challenges the following characterizations of her by the ALJ: (1) that she had the ability to prepare food, to "wash dishes with her husband's help," and to sit for 30 minute periods and (2) that she admitted that her pain medications were effective. (Doc. 9 at 49-50). Plaintiff is correct that some of the ALJ's characterizations were not entirely accurate. For instance, it is a stretch to say that Plaintiff had the ability to prepare food, when she consistently stated in her function report and at the hearing that she was limited to fixing soup, sandwiches, or microwavable items. (Compare R. 43, 151 & 153). Other characterizations were generally accurate. Plaintiff reported that she tried to wash the dishes daily with her husband's help, which is consistent with the ALJ's notation in his decision. (R. 151). The ALJ's characterization of her testimony concerning her medication also was in sum and substance accurate. He stated, "her medications

20

were slightly effective for pain." (R. 20). Plaintiff stated during her testimony that the medications were "slightly effective," allowing her to "be calm instead of whiny and irritable." (R. 45). The difference is inconsequential.

With regard to her ability to sit, the ALJ's characterization was accurate. Plaintiff testified at the hearing that she could not sit more than 10 to 15 minutes. She stated in her report that she could sit no more than 30 minutes. (Compare R. 40 & 151). Plaintiff also points out that it is un-contradicted that she cannot sit for long periods of time and that she needs to lie down for several hours a day. (Doc. 9 at 50). While Plaintiff is correct about the nature of her testimony, the latter point – that she needs to lie down for extended periods – is conspicuously absent from her function report. In describing her daily activities in her function report, she states that she will lie down around noon before she prepares lunch and then will lie on the couch for about 30 minutes later in the afternoon. (R. 151). At the hearing, she testified that she was lying down about six hours a day, four days a week since May 2012. (R. 40 & 44-45). On bad days she would lie in bed all day.[8] (R. 40-41 & 44-45).

In view of the differences between Plaintiff's hearing testimony – particularly that she lies down between six hours on a "regular day" and "all day" on a bad day; she has trouble putting on her pants, shoes, and socks; and she

---

[8] The function report was prepared June 15, 2012. (R. 158).

cannot shop, cook, or do any chores – and her statements in the function report that she prepared soup and sandwiches, visited her mother daily for about an hour, walked and drove, and shopped for groceries with her husband, the undersigned finds that the decision of the ALJ is supported by substantial evidence. In reaching this conclusion, the undersigned recognizes that a limited ability to perform activities of daily living do not preclude a finding of disability. *See Frizzell v. Astrue*, 487 F. Supp. 2d 1301, 1305-06 (N.D. Ala. 2007) (the claimant's limited daily activities, which included light household chores, going to church, cooking, and watching television, did not rule out the presence of disabling pain). However, here Plaintiff's activities and medical records do not support a finding that she is disabled.

To the extent that Plaintiff argues the ALJ failed to mention any of the objective evidence in Dr. Kelsey records, the court finds she is entitled to no relief for a number of reasons. First, the ALJ did examine and discuss the medical evidence from Dr. Kelsey. (*See* R. 13-15 & 22 ("The records of the claimant's pain management specialist, Dr. Kelsey, are afforded more weight, and do not indicate that the claimant has had disabling pain or limitations."). Second, most of the records Plaintiff cites in her brief date back to the period from 2006 until 2010, while Plaintiff was working. The only records cited from the approximate onset date (May 2012) are Dr. Kelsey's notations that Plaintiff had "'pain and tenderness

in the lower back' on March 21, 2012" and "forward flexon greater than 70 degrees increases her pain," which radiates into her left lower extremity.  (Doc. 9 at 47 (citing R. 177)).  Additionally, Plaintiff cites to a consultative x-ray on October 12, 2012, which shows "moderate interspace narrowing at L5-S1" and lower lumbar facet joint degenerative change most severe at L5-S1."  (*Id.* (citing R. 202)). The court fails to see how these limited records warrant altering the determination of the ALJ in this case.[9]  While the records demonstrate that Plaintiff had a physical impairment, they do not establish that she was disabled.

Plaintiff next argues that the ALJ failed to properly evaluate her situation in light of the relevant factors enumerated in SSR 96-7p.  (Doc. 9 at 53). Specifically, she asserts:

> If the ALJ had properly considered these factors, including [her] significantly limited daily activities, chronic back and leg pain ranking

---

[9] As part of this claim, Plaintiff asserts the ALJ "utterly dismissed the degenerative changes at the great toe MTP articulation in both feet, as well as numerous documented reports of edema." (Doc. 9 at 47 (citing R. 22)).  Contrary to Plaintiff's conclusory claim, the ALJ did specifically address the changes with the great toe and edema.  He stated:

> The claimant complained of foot pain to Dr. Hagler in August 2012 and January 2013, but right and left foot x-rays in August 2012 showed only mild degenerative changes at the great toe MTP articulation.  The claimant did not complain of foot pain or limitations at the hearing.  The claimant has only occasionally complained to Dr. Hagler of foot pain, also reporting to Dr. Hagler that Celebrex improved her foot pain.  In April 2013, the claimant denied to Dr. Hagler arthralgias, joint swelling, or abnormalities of gait.  Although Dr. Hagler reported that the claimant had lower extremity edema, as was discussed above, the claimant has exhibited very little lower extremity edema at any visit to any physician, and it appears that any lower extremity edema she may experience is well controlled.

(R. 22).

6 and going up to 10, the necessity to lie down for two to four hours each day, her history of medication adjustments, and her history of multiple types of treatment modalities, the ALJ would have found her testimony entirely credible.

(Doc. 9 at 53 (underline in original)).

Social Security Ruling (SSR) 96-7p provides, in pertinent part, that when assessing the credibility of an individual's statements, the ALJ must consider the following:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p (1996 WL 374186 (July 2, 19 96)).[10]  It is clear to the undersigned that the ALJ did make a full inquiry into Plaintiff's situation and properly considered

---

[10] SSR 96-7p, which was in effect when the ALJ issued her decision, has been superseded by SSR 16-3p effective March 28, 2016.  SSR 16-3p eliminates the use of the term "credibility" and instead provides that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, 2016 WL 1119029, *7 (March 16, 2016).

the various factors in SSR 96-7p.  For instance, the ALJ evaluated her testimony about her daily activities and her statements concerning her symptoms and compared them with the medical evidence (R. 20-23); he discussed the effectiveness of her medications (*id*. at 22); he discussed that Dr. Kelsey never assigned any functional limitations or opined that Plaintiff was disabled (*id*. at 21, 177-87, 190 & 216-17); he noted that Dr. Clark stated that Plaintiff should not do any heavy lifting or repeated squatting (*id*. at 21 & 199-200); and he stated that Dr. Hagler had noted that medication helped her foot pain (*id*. at 22-23, 221, 228 & 237).

### 3.  Testimony from the VE

Lastly, Plaintiff asserts that the hypothetical questions posed to the VE were incomplete in that they did not include all of Plaintiff's limitations.  (Doc. 9 at 55). Specifically, Plaintiff argues that the hypothetical left out her limitations of having to lie down for several hours a day, being able to sit for only one hour a day, and being expected to miss 30 days of work a year under the best of circumstances. (*Id*.) The Commissioner retorts that the ALJ's hypothetical question was consistent with Plaintiff's RFC.  (Doc. 12 at 14).

When an ALJ relies on the testimony of a VE, any hypothetical question that is posed to the VE must "comprise[] all of the claimant's impairments."  *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).  In this case, the court finds for the

reasons stated herein that the substantial evidence supports the ALJ's RFC finding that Plaintiff should be limited to "light work … with only occasional stooping and crouching; no climbing; no driving; no upper extremity or right lower extremity pushing and/or pulling…."  (R. 19).  Additionally, the court finds that Plaintiff has failed to show that she has additional limitations or that the ALJ erred when he assessed the medical evidence and her credibility. The ALJ's decision not to include Plaintiff's alleged additional limitations in the hypothetical to the VE is supported by substantial evidence in the record.  *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cr. 2004) (holding that an ALJ is "not required to include findings in the hypothetical that the ALJ [has] properly rejected as unsupported").  Accordingly, the  ALJ properly determined that Plaintiff would be able to perform light unskilled jobs that are available in the national economy in significant numbers.  (R. 25).

## V.  CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner is due to be affirmed.

**DATED** this 14th day of September, 2016.

JOHN E. OTT
Chief United States Magistrate Judge